**David L. SCHROEDER and Tana Schroeder, Petitioners-Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent-Appellee.**

**SKYLINE MEMORIAL GARDENS, INC., Petitioner-Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent-Appellee.**

**Nos. 86–7010, 86–7012.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1987.

Decided Oct. 29, 1987.

Dana R. Taylor, Portland, Or., for petitioners-appellants.

William Estabrook, Washington, D.C., for respondent-appellee.

Before SNEED and HALL, Circuit Judges, and AGUILAR,* District Judge.

CYNTHIA HOLCOMB HALL, Circuit Judge:

* Honorable Robert P. Aguilar, United States District Judge, Northern District of California, sitting by designation.

Appellants David L. Schroeder and Tana Schroeder,[1] and Skyline Memorial Gardens, Inc. filed petitions in the United States Tax Court seeking review of income tax deficiencies asserted by the Commissioner of Internal Revenue. The cases were consolidated for purposes of opinion and decision. The sole issue before the Tax Court and on appeal is whether the transfer in 1976 by appellant Schroeder of 705.6 shares of Skyline Memorial Gardens, Inc. (Skyline) stock to appellant Skyline, and the assumption by the latter of a portion of a bank loan in exchange, resulted in a distribution to Schroeder which was substantially equivalent to a dividend within the meaning of section 302(b)(1) of the Internal Revenue Code.[2] This Court has jurisdiction over the appeal pursuant to Internal Revenue Code section 7482(a).

### I.

The parties submitted the case to the Tax Court on stipulated facts. David Schroeder began employment at Skyline in 1972 as a funeral director. Fred Collins then owned all the outstanding stock of both Skyline and Lane Memorial Gardens, Inc. (Lane). In 1974 Schroeder was promoted to general manager of Skyline. In 1975 Collins died, and his stock in Skyline and Lane passed into his estate. Collins' wife Donna eventually succeeded as personal representative of the estate.

Schroeder and his uncle, Donald Morris, wished to purchase Skyline and Lane. Early in 1976, Donna and Schroeder each retained legal counsel to help with the transaction. Schroeder asked First State Bank of Oregon (State Bank) to make a loan of approximately $600,000 in connection with the purchase. State Bank was willing to make the loan to Skyline but not to Schroe-

der, because of Skyline's greater ability to service the loan.

On March 24, 1976, counsel for Donna and Schroeder agreed in principle to a transaction whereby Skyline would redeem about ninety percent of its stock from the Collins estate, and Schroeder and Morris would purchase the rest. On April 12, 1976, Donna and Schroeder agreed in principle to such a bootstrap acquisition of Skyline by Schroeder. On April 13, 1976, Schroeder executed a Loan and Security Agreement for $600,000 with State Bank on behalf of Skyline as the President of Skyline (which he was not). On the same day, unbeknownst to Donna, State Bank loaned $25,000 to Skyline on Schroeder's supposed authority.

On April 13, 1976, however, Donna decided not to sell her stock directly to Skyline. Her counsel feared that the transaction might impair Skyline's capital in violation of the Oregon Business Corporation Act. Furthermore, the transaction might result in a taxable gain to the estate, because Skyline planned to redeem its stock in part by transferring a Section 1250 asset to the estate, which would then sell it to Schroeder.

Donna was willing to sell the Skyline stock directly to Schroeder. On April 16, 1976, Donna and Schroeder executed an agreement to that effect, with the closing scheduled for April 30, 1976. On April 23, 1976, Schroeder and his wife signed and guaranteed a loan of $600,000 from State Bank to Skyline. On April 29, 1976, Schroeder's counsel told State Bank that the loan must be made directly to Schroeder. State Bank agreed to make a "gap" loan to Schroeder personally on the conditions that Skyline would assume responsibility for most of the loan immediately af-

---

**1.** Schroeder filed his tax returns jointly with his wife, who therefore is also a party to this case. All references to Schroeder, however, refer only to Mr. Schroeder.

**2.** All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue. As it read in the year in question, section 302(b)(1) provided as follows: "Redemp-

tions Not Equivalent to Dividends.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend." Section 302(a) provided that a redemption falling within section 302(b)(1) would "be treated as a distribution in part or full payment in exchange for the stock." In other words, a redemption essentially equivalent to a dividend would be treated as a dividend taxable as ordinary income rather than as capital gain.

ter Schroeder obtained the stock, and State Bank would have possession of the stock as security until then.

The purchase and sale closed as planned on April 30, 1976. State Bank presented a check for $600,000 made payable to the Collins estate. Schroeder executed a promissory note and a loan agreement whereby he promised to pay $600,000 to State Bank. The corporation issued a stock certificate in Schroeder's name, and this was delivered to the bank as security for its loan to Schroeder.

On August 1, 1976, the new board of directors of Skyline held a special meeting to discuss and approve a restructuring of State Bank's $592,857.15 loan to Schroeder.[3] Skyline, Schroeder, and Morris each assumed a portion of the loan and received an approximately proportional amount of Skyline stock.[4] In particular, Skyline assumed $400,000 of the loan and cancelled $20,000 of a debt Schroeder owed it in exchange for 705.6 shares of stock. It is this receipt that the Internal Revenue Service proposes to tax as a dividend to Schroeder.

The Internal Revenue Service audited Skyline and sent Schroeder a Notice of Deficiency pertaining to his 1976 and 1977 returns which did not report any income from the redemption of the stock. Schroeder and Skyline petitioned the Tax Court for review, and the Tax Court found in favor of the Commissioner. Schroeder and Skyline filed a consolidated appeal.

## II.

We review facts, including inferences made from a stipulated record, only for clear error. *Vukasovich, Inc. v. Commissioner*, 790 F.2d 1409, 1411 (9th Cir.1986). We review questions of law de novo. *Id.* at 1413.

Whether a distribution is essentially equivalent to a dividend is "a mixed question of law and fact, if not purely a conclusion of law." *Kerr v. Commissioner*, 326 F.2d 225, 229 (9th Cir.), *cert. denied*, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735 (1964), *followed, Tabery v. Commissioner*, 354 F.2d 422, 427 (9th Cir.1965). This case primarily concerns the legal significance of undisputed facts. Therefore, de novo review is appropriate. *Sennett v. Commissioner*, 752 F.2d 428, 430 (9th Cir.1985).[5]

## III.

Schroeder urges this court to view as a single transaction his purchase of Skyline's stock and Skyline's later redemption of a substantial portion of it, so that the redemption will be deemed to have been directly from the Collins estate. He supports his position by arguing that the purchase and redemption were parts of a prearranged plan and intended as a single transaction. Specifically, Schroeder con-

---

3. The principal of the debt had been reduced from $600,000 by Schroeder's payment of $12,-601.86 due May 26, 1976. $7,142.85 was a repayment of principal.

4. Stock received was not precisely proportional to the amount of the loan assumed because of an earlier transaction between Skyline and Schroeder. After Skyline borrowed $25,000 from State Bank on April 13, 1976, it loaned the money to Schroeder, who tendered it to Donna's attorney as a down payment conditioned on Donna's executing an interim agreement for the sale of the Skyline and Lane stock to Schroeder. On May 3, 1976, Skyline paid $25,126.37 to State Bank to repay the loan with interest. On the same day, Schroeder entered into a term loan agreement to repay this sum, plus interest at seven percent, to Skyline. When the loan was restructured on August 1, 1976, Skyline cancelled $20,000 of Schroeder's indebtedness in recognition of his receipt of a smaller amount

of stock than the proportion of the loan that Skyline assumed.

5. Our case law conflicts on the question of whether we should accord to the Tax Court special deference in deciding questions of law under the Internal Revenue Code. In *Vukasovich*, we rejected any general rule of special deference to the legal conclusions of the Tax Court. 790 F.2d at 1411–13. We have not consistently followed *Vukasovich*, however. In the earlier case of *Magneson v. Commissioner*, 753 F.2d 1490, 1493 (9th Cir.1985) (disapproved of in *Vukasovich*), we noted that the Tax Court's "opinions are entitled to respect because of its special expertise in the field." *Id.* We recently followed *Magneson* in *Graham v. Commissioner*, 822 F.2d 844, 848 (9th Cir.1987). Regardless of whether we accord any degree of special deference to the legal opinions of the Tax Court, we reach the same result in the case before us.

tends the following: that it always was his intention that Skyline should redeem its shares; that his acquisition of the stock of Skyline in his own name and pursuant to his own personal obligation to State Bank was nothing more than a temporary expedient, required by the Collins estate as well as by State Bank; and that his acquisition of the Skyline shares on April 30, 1976 should be considered simply as a first step of the transaction which culminated in Skyline redeeming its shares on August 1, 1976.

The Tax Court found that "there was no common or mutually agreed plan of action between the estate of Fred Collins, Schroeder and Skyline whose object was the ultimate redemption by Skyline of a part of its stock." *Skyline Memorial Gardens, Inc. v. Commissioner,* 50 T.C.M. 360, 367 (1985). We agree with the Tax Court. The record confirms Schroeder's stated intentions, but also shows that this intention was particular to him. Donna Collins, as the personal representative of her husband's estate and as the seller of Skyline's stock, made it clear to Schroeder by April 13, 1976, that she would not agree to Skyline redeeming its stock as part of a bootstrap acquisition of Skyline proposed by Schroeder. Instead, she insisted that Schroeder buy the stock personally, which Schroeder undertook to do. In addition, Skyline cannot have had any intention different from Donna's, since she controlled 100 percent of Skyline's stock.

Schroeder, because of Donna's insistence, could not undertake a bootstrap acquisition and had to buy the Skyline stock himself. He had business reasons for choosing the form of the transaction that he did. He cannot argue now that he is immunized from tax because the transaction was really something that never occurred. *See Television Industries, Inc. v. Commissioner,* 284 F.2d 322, 324–25 (2d Cir.1960) (Friendly, C.J.). Schroeder held the stock for three months from April 30, 1976 to August 1, 1976 before Skyline redeemed a portion of his shares proportion-

ate to the amount of his personal debt that Skyline assumed. Before the corporation redeemed its shares, Schroeder owned all of Skyline's outstanding stock. After the redemption, Schroeder still owned the entire equity interest in the corporation.[6] Thus, Skyline made a constructive distribution to Schroeder of a taxable dividend when Skyline relieved Schroeder of $400,000 of his personal debt to State Bank and $20,000 of a debt Schroeder owed to the corporation in exchange for an equivalent value in shares of Skyline stock. *See United States v. Davis,* 397 U.S. 301, 313, 90 S.Ct. 1041, 1048, 25 L.Ed.2d 323 (1970); *Tabery v. Commissioner,* 354 F.2d 422 (9th Cir.1965); *Adams v. Commissioner,* 594 F.2d 657 (8th Cir.1979).

Schroeder's contention that he acted as an agent or conduit for the corporation pursuant to a prearranged plan is without merit. First, as noted above, there was no mutually agreed plan between Collins and Schroeder or between Schroeder and Skyline. The intention to have the corporation redeem its own stock was Schroeder's intention alone. Second, when he acquired the stock on April 30, 1976, "Schroeder was neither an officer, director nor a shareholder of Skyline, and he had no apparent authority to bind or commit Skyline to acquire its own stock or to borrow $600,000 from the bank in Skyline's name." *Skyline Memorial Gardens, Inc.,* 50 T.C.M. (CCH) at 368. Schroeder's actions in arranging loans for Skyline with State Bank, falsely signing himself as Skyline's president, were unauthorized. It was not until after he acquired sole ownership of the Skyline stock, on July 1, 1976, when the debt to State Bank was restructured, and on August 1, 1976, when Skyline redeemed his stock, that Schroeder caused his intention to become Skyline's as well. Schroeder was not Skyline's agent or conduit on April 30, 1976. Prior to that time, he was not even a shareholder. *See Adams v. Commissioner,* 594 F.2d at 661; *Wall v. United*

---

**6.** Although after the transaction of August 1, 1976 Schroeder possessed only a seventy percent equity interest in Skyline, this change represented Schroeder's sale of thirty percent of his stock to Morris rather than the redemption of his shares by Skyline.

*States,* 164 F.2d 462, 465–66 (2nd Cir. 1947).[7]

## IV.

Schroeder further contends that, even if he were acting on his own behalf, his obligation to acquire the Skyline stock from the Collins estate was conditional. Schroeder argues that his obligation to purchase the stock was conditioned upon the Collins estate tendering $107,964.80 at the April 30, 1976 closing. This sum was paid by Collins out of the cash purchase price received from Schroeder. Because Collins could not have performed its obligations under the contract unless Schroeder first performed, Schroeder concludes that his obligation to purchase the stock was conditional. Therefore, he argues, the corporation never discharged him from an unconditional obligation, and consequently never paid him a dividend. This argument also is without merit.

Every executory contract that requires the parties to perform at a later date is conditional in the sense that every contract is conditional until fully executed: one party or the other, or both, may fail to perform. Further, Schroeder's argument ignores the fact that the transaction with the Collins estate was completed. After the closing, Schroeder took title to the stock, and was unconditionally bound to pay State Bank $600,000. Skyline later relieved him of a significant portion of his debt. Therefore, we agree with the Tax Court's finding that Schroeder's contract to buy the Skyline stock from the Collins estate was an unconditional obligation.

AFFIRMED.

---

7. Schroeder's reliance on *Bennett v. Commissioner,* 58 T.C. 381 (1972), is unfounded. In *Bennett,* the loan was made directly to the corporation, not the taxpayer. Here, the loan to Schroeder represented his primary obligation to pay for the Collins's stock. Further, the taxpayer in *Bennett* owned one-third of the corporation's stock, was president and a director of the corporation, and acted with written authority to vote the entire block of the seller's shares in the corporation. Here, as noted above in text, Schroeder had no such authority. Finally, the entire transaction in *Bennett* took but a moment; here, Schroeder held the Skyline stock for three months before the corporation redeemed his shares.

Similarly, Schroeder's reliance on *Fox v. Harrison,* 145 F.2d 521 (7th Cir.1944), *Ciaio v. Commissioner,* 47 T.C. 447 (1967), and *Peterson v. Commissioner,* 23 T.C.M. (CCH) 63 (1964), is inapposite. In *Fox,* the taxpayer was vice-president of the corporation, owned one-third of its stock, and the corporation consented to the taxpayer's actions. In *Ciaio,* the taxpayer owned one-third of the corporation's stock and the corporation approved of the taxpayer's loan to finance the acquisition prior to the transaction. Finally, in *Peterson,* the taxpayer owned twenty-five percent of the corporation's stock and was its president.